1

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
2
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
3
Walnut Creek, CA 94596
Telephone: (925) 300-4455
4
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
5
        slitteral@bursor.com

6
*Attorneys for Plaintiff*

7

8
### UNITED STATES DISTRICT COURT

9
### NORTHERN DISTRICT OF CALIFORNIA

10

11

12
JASMINE SMITH, individually and on behalf of all others similarly situated,

Case No.

13
Plaintiff,

**CLASS ACTION COMPLAINT**

14
v.

15
GLAXOSMITHKLINE, PLC and GLAXOSMITHKLINE CONSUMER HEALTHCARE,

JURY TRIAL DEMANDED

16

17
Defendants.

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Jasmine Smith ("Plaintiff") brings this action on behalf of herself and all others similarly situated against GlaxoSmithKline, PLC and GlaxoSmithKline Consumer Healthcare (collectively, "Defendants") for the manufacture, marketing, and sale of Abreva cold sore treatment cream as identified below.  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which is based on personal knowledge.

## NATURE OF THE ACTION

1.     This is a Class Action against Defendants GlaxoSmithKline, PLC and GlaxoSmithKline Consumer Healthcare (collectively, "GSK" or "Defendants") for the manufacture, marketing, and sale of Abreva cold sore treatment cream (hereinafter the "Product").  Defendants represent that Abreva can heal a cold sore in 2 ½ days, but it does not.  Defendants further represent that "[n]othing heals a cold sore faster," despite readily available alternatives that do purport to heal cold sores faster.  Worse, Defendants exceed the scope of its approval by the Food and Drug Administration ("FDA"), by making these and other unsupported representations concerning the ability of Abreva to provide symptomatic and anti-viral benefits.  Thus, Defendants' advertising is false and misleading, and the Product is ineffective as advertised and unsuitable for its intended purpose.

2.     Plaintiff brings her claims against Defendants individually and on behalf of a class of all others similarly situated purchasers of the Product for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (2) violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (3) violation of the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, *et seq*.; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (5) Breach of Express Warranty; (6) Breach of Implied Warranty of Merchantability; (7) Fraudulent Misrepresentation; (8) Negligent Misrepresentation; (9) Fraud by Omission; and (10) Unjust Enrichment.

## PARTIES

3.     Plaintiff Jasmine Smith is, and at all times relevant to this action has been, a resident of Oakland, California.  In or around February 2021, Plaintiff Smith purchased Abreva from a brick-

and-mortar CVS Pharmacy.  In doing so, Plaintiff Smith relied upon Defendants' advertising, packaging, labeling, and other promotional materials, including Defendants' website and commercials as prepared and approved by Defendants and their agents and disseminated through advertising media containing the unlawful claims alleged herein.  The specific representations, of which, are outlined in detail below.  Specifically, Plaintiff Smith understood and appreciated from Defendants' packaging, website, and commercials that Abreva would heal her cold sores in 2 ½ days, that nothing would heal her cold sore faster, and that Abreva would provide symptomatic relief, thereby reducing the pain, itching, burning, and tingling associated with cold sores.  Plaintiff Smith also understood that Abreva would provide anti-viral benefits that would block the emergence of cold sores and prevent the development of new cold sores by maintaining healthy skin cells.  These were Plaintiff Smith's primary reasons for purchasing Abreva.  Plaintiff Smith understood Defendant's claims to be representations and warranties that Abreva could provide her desired results.  And Plaintiff Smith relied on these representations and warranties in purchasing Abreva.  However, Plaintiff Smith received none of the benefits of her bargain.  Her cold sore did not heal during the 2 ½ days as advertised nor did it heal within the time period set out in Abreva's disclaimers or other clarifying language, which Plaintiff does not recall seeing prior to purchase.  Nonetheless, Plaintiff Smith remains very much interested in purchasing Abreva in the future as she believes Defendants are reputable companies that otherwise manufacture and produce over-the-counter products that are high in quality.  As a direct result of Defendants' material misrepresentations and omissions, Plaintiff Smith suffered, and continues to suffer, economic injuries.

4.      Defendant GlaxoSmithKline, PLC is a Pennsylvania corporation headquartered in Philadelphia, Pennsylvania.  GlaxoSmithKline, PLC is the parent company of Defendant GlaxoSmithKline Consumer Healthcare, which manufactures, markets, and distributes Abreva throughout the United States.

5.      Defendant GlaxoSmithKline Consumer Healthcare is a division of Defendant GlaxoSmithKline, PLC, headquartered in Warren, New Jersey.  The Consumer Healthcare division comprises several major brands of over-the-counter drugs, including Abreva Cold Sore Cream.  Defendant manufactures, markets, and distributes Abreva throughout the United States.  Defendant

sells the Product on its website directly to consumers and through third-party retailers such as CVS, Walgreens, Target, and Amazon.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.

7.      This Court has personal jurisdiction over Defendants because Defendants conduct substantial business within California such that Defendants have significant, continuous, and pervasive contacts with the State of California.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District as Plaintiff saw and heard Defendant's advertisements and resides in this District.

## FACTUAL ALLEGATIONS

**I.      Overview Of Cold Sores And Over-The-Counter Treatments**

9.      Cold sores, also known as fever blisters, are caused by the herpes simplex virus (HSV).  Herpes infection is extremely common—it is estimated that between 50% and 80% of adults in the United States are carriers of either HSV-1 (oral herpes) or HSV-2 (genital herpes).  Once infected, the virus remains in the body permanently, periodically causing painful and unsightly blisters (cold sores) to form, usually on the lips.

10.      According to the Mayo Clinic, cold sores typically last around two to four weeks before healing on their own.[1]  Outbreaks can be triggered by a variety of factors such as stress, fatigue, colds and fevers, or exposure to cold weather or sunlight.  While common, cold sores are

---

[1] "Cold Sore," Mayo Clinic, (June 17, 2020), https://www.mayoclinic.org/diseases-conditions/cold-sore/diagnosis-treatment/drc-20371023 (last accessed November 30, 2021).

often "embarrassing and tough to hide[.]"[2]  Those with a cold sore outbreak may experience anxiety, stigma, shaming, and social isolation.[3]

11.    Although there is no known cure for HSV, several prescriptions and over the counter ("OTC") treatments exist, intended to relieve discomfort, shorten healing time, or reduce transmission of the virus.  Collectively, US adults living with HSV develop over 100 million outbreaks annually, most of which are treated with OTC medications.

12.    Abreva is one of those OTC medications and is the leading OTC cold medication. Abreva is topical cream containing 10% of the active ingredient docosanol, intended to make cold sores heal faster.  This ingredient is currently the only ingredient approved by the FDA to shorten healing time that is available without a prescription.

13.    Abreva was originally developed by Avanir Pharmaceuticals, which held clinical trials of the active ingredient, docosanol, and received FDA approval for a limited set of claims in 2000.  That year, Defendants licensed exclusive rights from Avanir and began selling Abreva throughout the United States.

14.    Avanir's approval of the ingredient, however, was not immediate due to concerns with the underlying studies that Avanir used to support its New Drug Application.  The authors of the underlying studies reported that docosanol shortened the time to lesion healing and cessation of pain in comparison with the control group.  However, these studies were originally rejected by the FDA in 1999 after first determining that the underlying studies "ha[ve] not revealed convincing evidence for a consistent effect," and then citing the need for additional trials.[4]

---

[2] Ian Roth, "Mayo Clinic Minute: 3 things you didn't know about cold sores," Mayo Clinic (Mar. 21, 2018), https://newsnetwork.mayoclinic.org/discussion/mayo-clinic-minute-3-things-you-didnt-know-about-cold-sores/#:~:text=Cold%20sores%20on%20the%20lips,you%20have%20a%20cold%20sore (last accessed November 30, 2021).

[3] *See e.g.*, Hollie Richardson, "Cold sores: why we get them, how to treat them, and how to break the stigma," *Stylist* (May 2021), https://www.stylist.co.uk/beauty/skincare/cold-sores-treatments-symptoms-facts/522295 (last accessed November 30, 2021).

[4] S.L. Spruance, "N-docosanol (Abreva) for herpes labialis: problems and questions." *J. Am Acad. Dermatol*. 2002 3 ([letter]): 457-458. https://www.jaad.org/article/S0190-9622(02)70066-2/pdf.

15.     In rejecting Avanir's New Drug Application, Robert J. DeLap, M.D., Ph.D., Director of the Office of Drug Evaluation for the FDA's Center for Drug Evaluation and Research stated in a letter to Avanir that *"[t]he effectiveness of [docosanol] 10% in the treatment of recurrent oral-facial herpes simplex has not been adequately established."* (emphasis added).  Dr. DeLap determined that there was no "significant[] differe[nce]" between the docosanol and the placebo.

16.     Dr. DeLap's conclusions were further bolstered by Medical Reviewer, Martin M. Okun's, M.D., Ph.D, evaluation of Avanir's studies.  Dr. Okun determined that *"there may have been significant technical flaws in the execution of [Avanir's] study."* (emphasis added).  Dr. Okun further found that Avanir's *"concept of complete healing . . . differs from a layperson's concept of complete healing, which would be return of lesional skin to normal both in signs and symptoms."* (emphasis added).

17.     Avanir appealed this decision and ultimately won approval for a limited set of claims. Specifically, Dr. DeLap warned Avanir that *"[y]ou are cautioned not to promote the product as an antiviral or as providing symptomatic relief of cold sores.  Promotion of symptomatic benefit should be limited to the information provided in labeling, that the product shortens healing time and duration of symptoms."* (emphasis added).

18.     However, as discussed below, Defendants have since overstepped the FDA's approval.  That is, the FDA did not approve any of the claims that Plaintiff alleges are false or misleading.

## II.     Defendants' False And Deceptive Advertising

19.     Despite these warnings, Defendants, through their aggressive long-term, decades long, deceptive marketing campaign, including advertisements, Abreva Products' packaging and labeling, its website as well as commercials and bulletins, amongst other mediums, has consistently conveyed to consumers throughout the United States that Abreva reduces healing time to 2 ½ days, prevents the virus causing cold sores from developing, and provides symptomatic relief.

20.     On the whole, Defendants' campaign created a context for consumers who purchased the Product in store or online.  That is, Defendants exploited the overlap between labeling and

marketing and led consumers to believe that Abreva heals cold sores in 2 ½ days, that it prevents the virus causing cold sores from developing, and that it provides symptomatic relief.

21.     As set out in the photograph below, Defendants prominently claims in large text that **"YOU CAN GET RID OF YOUR COLD SORES IN 2 ½ DAYS."**  Then at the extreme bottom edge of the photograph, and not in close proximity to the challenged claims, Defendants set out a disclaimer.  But those, like Plaintiff, viewing this photograph online—which is where it appears—are not likely to see this inconspicuous disclaimer.  A reasonable consumer viewing this photograph would be led to believe that their cold sore would heal in 2 ½ days if they purchased Abreva.



22.     Defendants repeat these statements in the photograph below, claiming that Abreva "CAN GET RID OF COLD SORES IN JUST **2.5 DAYS**."  Then at the extreme bottom edge of the photograph, and not in close proximity to the challenged claims, Defendants set out a disclaimer in a color font similar in color to the background on which it appears.  But those viewing this photograph online—which is where it appears—are not likely to see this inconspicuous disclaimer.  Instead, reasonable consumers would understand that Abreva heals cold sore in 2 ½ days.



23.     Defendants repeat these and other statements in the below bulletin.  In large font at the top of the bulletin, Defendants ask **"WHY ABREVA?"**  Defendants then lists several purported reasons for purchasing in slightly smaller, but readable, font.  These include "Can get rid of your cold sore in 2.5 days, when used at the first sign," "Starts to work immediately," "Helps protect healthy skin cells," and "Shortens symptom durations."  Then at the extreme bottom of the bulletin in a font color similar to the background, Defendants set out a disclaimer.  But those, like Plaintiff, viewing this photograph online—which is where it appears—are not likely to see this inconspicuous disclaimer.  Instead, reasonable consumers are led to believe that Abreva heals cold sores in 2 ½ days and provides symptomatic relief and anti-viral protection.



24.     Defendants then repeat these and other statements in the below bulletin.  In large font at the top of the bulletin, Defendants state that **"ABREVA WORKS IN 3 KEY STAGES."**  Defendants then list those stages in slightly smaller, but readable, font.  Defendants claim that Abreva "Penetrates deep beneath the skin, to the source of the spreading virus."  Defendants claim that Abreva "Helps block the virus and helps protect healthy skin cells."  Defendants then claim that "Used at the first sign, can get rid of your cold sore in 2 ½ days."  A reasonable consumer would be justified in their belief that Abreva provides symptomatic relief and anti-viral protection and that it heals cold sores in 2 ½ days.

///

///

///

1
2
3
4
5
6
7
8
9



10    25.    But Defendants' statements concerning the duration of healing do not end there.

11  Instead, Defendants claim directly on the home page of their website that "*Nothing heals a cold sore*

12  *faster*." (emphasis in original).  Defendants include a so-called disclaimer at the extreme bottom left

13  of the page, far out of sight of the viewer and in tiny font which reads, "[m]edian healing time 4.1

14  days.  25% of users healed within 2 ½ days."  But significantly, this disclaimer does not correspond

15  with the challenged assertion.  In other words, that Abreva supposedly shortens healing time has

16  nothing to do with the other options available on the market.  Defendants' disclaimer is, therefore,

17  inapposite and ineffective at remedying the deception, especially considering that there are other

18  options available on the market that do purport to shorten healing time faster.[5]

19    26.    Defendants then repeat these and other statements in the below graphic.  Defendants

20  claim that Abreva is "**PROVEN TO HEAL COLD SORES & SHORTEN THE DURATION**

21  **OF**[.]"  Interestingly, Defendants set out "Pain," "Itching," "Burning," and "Tingling" on their own,

22  easily catching the reasonable consumer's eye, leading them to believe that Abreva provides

23  symptomatic relief.  Noticeably, there is no disclaimer other than the "when used at the first sign"

24  language at the extreme bottom left of the graphic.

25

26  _____

27  [5] *See, e.g.* Luminance Red which purports to heal cold sores in as few as 2.2 days.
    https://luminancered.com/products/luminance-red-lip-treatment-
28  device?network=g&gclid=Cj0KCQiAtJeNBhCVARIsANJUJ2HIfrpjEW33UoB5gHMdotvWTBX
    NaRzdaL3tODmX5zu7nWaQtmIgiJUaAs_1EALw_wcB (last accessed November 30, 2021).

1

2

3

4

5

6

7

8



9       27.     Defendants' representations extend to commercials released by Defendants.  In one

10  video, for example, Defendants claim "Just because there isn't a cure for cold sores, doesn't mean

11  you have to ***suffer patiently*** until it clears up on its own." (emphasis added).  Defendants' statement

12  taken in context would lead a reasonable consumer, like Plaintiff, to believe that Abreva will help

13  ease suffering, by reducing the pain associated with the cold sore.  These words next to a photograph

14  of a woman holding her lip and wincing would further lead a reasonable consumer to believe that

15  Abreva will reduce their pain.

16

17

18

19

20

21

22

23

24

25      28.     In another video, Defendants repeat their claims regarding healing time, noting that

26  "When used at the first sign, you could knock out your cold sore in 2.5 days."  Then at the extreme

27  bottom edge of the video, and not in close proximity to the challenged claims, Defendants set out a

28  disclaimer.  But those viewing this video are not likely to see this inconspicuous disclaimer.  Instead,

reasonable consumers are led to believe that Abreva can quickly heal areas affected by the cold sores and that it "block[s]" the virus.



29.     Interestingly, Defendants' 2 ½ day healing claims are entirely missing from their Canadian website, replaced instead with the words "Works Faster."[6]

30.     Yet, in the United States, Defendants up the ante, seeking to take advantage of the stigma and embarrassment associated with cold sores.  In one video, for example, Defendants portray a young woman with a large cold sore on her upper lip.  On her cheeks the words "UPSET" and "ANXIOUS" are prominently written.  The woman appears to be embarrassed and pained by her cold sore.



---

[6] https://www.abreva.ca/

31.     The camera quickly pans to the same woman applying Abreva as the narrator states that "one of the worst things about cold sores is how it can make you feel.  But . . . Abreva can get you back to being you in just 2.5 days."  Defendants then show the same woman refreshed with her cold sore no longer present.  In a faint font at the bottom of the screen, hardly noticeable in contrast to the bolded words, Defendants set out their disclaimer.  Defendants' disclaimer is immaterial, however, as the claims exceed the bounds of the FDA's approval.



32.     Defendants then write on their packaging that it is the "ONLY FDA Approved Medicine to Shorten Healing Time."



33.     But these muted claims are amplified by the context of Defendants' aggressive decades long marketing and advertising campaign, which invoked claims that exceed the scope of

the FDA's approval.  Placed in context, this packaging leads consumers, like Plaintiff, to believe that not only does Abreva shorten healing time, but that they could reasonably expect their healing time to be just 2 ½ days, and that during that time they would experience symptomatic and anti-vital benefits.

34.     Based on the current and former representations contained on Defendants' and third-party websites, commercials, and Abreva's packaging, it is clear that Defendants intended to induce a common belief in consumers that Abreva shortens the healing time to 2 ½ days, and provides symptomatic and anti-viral benefits for all those who use the Product.  In marketing Abreva in this manner, Defendants exceeded the scope of the FDA's approval to claims that the FDA specifically instructed Defendants not to make.  Moreover, Defendants have misrepresented the FDA's approval to further its over-the-counter market share of topical cold sore treatment.

### III.     Scientific And Medical Studies Confirm That Abreva And Its Main Ingredient Docosanol Are Not Effective

35.     As noted, Defendants' representations are prominently displayed in their aggressive and deceptive long-term and multi-medium advertising of Abreva, leading reasonable consumers to believe that if the Product is used in accordance with the instructions that their cold sores will heal in as few as 2 ½ days.

36.     However, these representations are false.  As Defendants' own research shows, Abreva cannot heal a cold sore in 2 ½ days.  Any improvement in healing time is much less significant than this, and for many users, the Product actually worsens symptoms without improving healing time whatsoever.  Significantly, Defendants' research has been refuted again and again.  Said simply, Abreva does not work as advertised by Defendants.

37.     As a result of Defendants' false representations, consumers who reasonably rely on these representations are charged an exorbitant price relative to other over-the-counter remedies.

#### A.     Avanir's Studies Confirm That Abreva Is Not Effective

38.     In July 2000, the FDA approved Abreva as an OTC treatment for recurrent oro-facial herpes simplex episodes (cold sores).  Approval was based on data from two clinical trials that Avanir conducted from 1996 to 1997.

39.     These trials designated "06" and "07," compared a 10% docosanol cream to a polyethylene glycol ("PEG") placebo.  Study 06 found a statistically significant shorter healing time with docosanol than with the placebo, but study 07 did not.  In Avanir's earlier clinical trials using a different placebo (stearic acid), docosanol failed to show any therapeutic advantage over the placebo.

40.     Rather than invest in additional research, Avanir combined the data from studies 06 and 07 and analyzed them collectively as a single "06/07" study.

41.     As part of the FDA approval process, the Center for Drug Evaluation and Research (CDER) conducted a medical review of the clinical trials.  Several of the reviewers' comments note flaws in the study design which undermine the basis for Defendants' claims about healing time.

42.      First, the data on healing times depended on patients' self-reporting of facts that a layperson might not be able to judge as accurately as a medical professional:

> The primary efficacy variable, time to healing, was measured by subtracting the time and date at which study cream was first applied (as determined by patient) from the time and date at which herpetic lesion [fully healed] (as assessed by patient) … There was no assessment performed in this study to confirm that patients were able to identify properly when episodes began, the stage of their episode when treatment was started, and when episodes healed.  Hence, it is difficult to assess whether the reported results … are reliable.

43.     Second, the studies included "aborted episodes"—outbreaks in which the early symptoms "resolve[] without ever progressing to the vesicular stage" (i.e. the formation of a blister). These episodes were, by definition, much shorter than "classical episodes" (which progress through several stages of blister formation and healing). Including both aborted and classical episodes in the data skewed the average healing time, making it seem shorter than it really was.

44.     Third, the studies separated early and late treatment results on the theory that early treatment is essential for docosanol to be effective.  But what appeared to be improved healing times for the early treatments simply reflected the fact that a certain proportion of aborted episodes would never have developed into "classical" lesions. When treatment started after a blister had already formed, docosanol showed no statistically significant advantage over the placebo.  In other words, by the time that what most people think of as the "cold sore" had appeared, it was already too late.

Thus, in order for the Product to have any beneficial effect, it must be applied at such an early stage that it is impossible to determine what difference it made.

45.     Because of this logical flaw in the early treatment hypothesis, as well as the gap between medical and layperson's understandings of what constitutes the "first sign of a cold sore," the inconspicuous disclaimer that Defendants use with the 2.5 days claim is ineffective.

46.     Defendants then licensed Abreva from Avanir, adopting their statements about the clinical trial results, and has continued to base its misleading advertising claims on Avanir's flawed studies.

### B.     Scientific And Medical Studies Refute Defendants' Claims

47.     But Defendants' deception has not gone unnoticed by members of the medical and scientific communities.  One such researcher, Dr. S.L. Spruance, published an article in the *Journal of the American Academy of Dermatology*.[7]  Dr. Spruance determined that there were several issues with the study that Defendants have since used to support their claims.  First, Dr. Spruance found that "***the uses of a substance other than the drug vehicle as a control represents a major departure from accepted practices and introduced doubt concerning the stated outcomes of the study***." (emphasis added).  Threading the needle, Dr. Spruance wrote that "[t]he usual comparison in topical drug studies, drug versus drug vehicle, ensures that any effect on the disease will occur equally in the treatment groups and that any differences between the treatment groups can be attributed to the test drug."  This was not the case in the Abreva trials, introducing other explanations for the outcome of the studies than that posited by Avanir.

48.     Second, the studies, to their detriment, employed polyethylene glycol ("PEG") in the control group.  According to Dr. Spruance, "[t]here are at least 2 theoretical ways that the use of PEG as a control could influence the relative rates of wound healing and create an appearance of efficacy, erroneously in the n-docosanol treatment arm."  Dr. Spruance noted that firstly "PEG is hygroscopic (absorbs water) and may dehydrate the skin.  The state of dehydration of the skin is well known to influence the rate of wound healing," thereby skewing Avanir's results.  Dr. Spruance then secondly

---

[7] S.L. Spruance., "N-docosanol (Abreva) for herpes labialis: problems and questions."  J. Am Acad. Dermatol. 2002 3: 457-458. https://www.jaad.org/article/S0190-9622(02)70066-2/pdf.

stated that "because the protocol called for continuous use of the study medication until lesion healing, it is possible that the n-docosanol aqueous cream vehicle had a greater ability than PEG to dissolve or loosen the lesion crust, a healing end point, resulting in the appearance of accelerated healing for the n-docosanol treatment arm."  The appearance of healing, but not actual healing.

49.     Another researcher Paul Pham published his research on docosanol in the medical journal, *Infection Diseases in Clinic Practice*.[8]  His study led him to conclude that "[t]opical docosanol improved healing time by approximately 1 day if applied during the prodromal stage," meaning "the period after incubation and before the characteristic symptoms of infection occur."[9] This determination drastically undermines Defendants' claims concerning the length of healing time. If the usual healing time for an untreated cold sore is ten days, then one day does not lead to the 2 ½ total claim posited by Defendants.  Instead, Abreva may require 9 days to heal the area affected by the cold sore.

50.     Another researcher, Eric M. Morrel published his research in the *Clinical Infectious Diseases* journal hosted by Oxford University Press.[10]  He determined that "[t]he topical treatments [including Abreva] demonstrated limited efficacy and required multiple applications over several days[.]"  This further undermines Defendants' claims that Abreva can heal a cold sore in just 2 ½ days.

51.     Perhaps the most comprehensive review of docosanol as a topical treatment for cold sores was conducted by Kimberly D.P. Hammer, Jessica Dietz, Tze Shien Lo, and Erika M. Johnson and published in the *European Medical Journal of Dermatology*.[11]  Those researchers reviewing

---

[8] Paul Pham, "Docosanol (Abreva)." Infectious Diseases in Clinical Practice: June 2001, Vol. 10, Iss. 5, p.283,
https://journals.lww.com/infectdis/Fulltext/2001/06000/Docosanol__Abreva__.18.aspx.

[9] https://www.medicalnewstoday.com/articles/5-stages-of-infection#incubation

[10] Eric M. Morrel, et al. "Topical Iontophoretic Administration of Acyclovir for the Episodic Treatment of Herpes Labialis: A Randomized, Double-Blind, Placebo-Controlled, Clinic-Initiated Trial." *Clinical Infectious Diseases*, vol. 43, no. 4, Oxford University Press, 2006, pp. 460–67, http://www.jstor.org/stable/4463841.

[11] Kimberly D.P. Hammer, Jessica Dietz, Tze Shien Lo, Erika M. Johnson, "A Systematic Review on the Efficacy of Topical Acyclovir, Penciclovir, and Docosanol for the Treatment of Herpes Simplex Labialis,"  EMJ Dermatol, Vol. 6, Iss. 1, p.118-123, https://emj.emg-health.com/wp-content/uploads/sites/2/2018/10/A-Systematic-Review-on-the-Efficacy-of-Topical-Acyclovir-Penciclovir-and-Docosanol-for-the-Treatment-of-Herpes....pdf.

---

1,485 scientific and medical papers concerning the efficacy of docosanol determined that the "efficacy compared to placebo is marginal at best."

52.    And in his research published in the *Archives of Dermatology*, Mark B. McKeough, refuted Defendants' anti-viral claims, concluding that "despite reports of n-docosanol antiviral activity in vitro, we found that both n-docosanol and stearic acid were inactive as antiviral agents against experimental cutaneous HSV lesions."[12]

**IV.    Consumers Experience With Abreva Further Demonstrates That It Is Ineffective**

53.    The internet is replete with complaints from consumers who have expressed dissatisfaction about the Product's ineffectiveness on Abreva's own website and numerous review pages on major e-commerce sites.

54.    For example, Abreva.com includes a reviews page with over a thousand reviews dating back approximately nine years.  In early 2021, for example, one user wrote on Abreva.com the following: "On the commercial it says gone in 2 days.  The website says 2.5 days.  My cold sore took longer than that to go away."[13]

55.    In 2019, another user wrote on Abreva.com the following: "I've been using this 3+ times a day for 11 days now and just when I thought it was finally gone, it has gotten worse.  This product isn't helping like it claims it does."

56.    In 2019, another user wrote on Abreva.com the following: "This product is very expensive and does not work at all. You all should be ashamed."

57.    In 2019, another user wrote on Abreva.com the following: "This product does absolutely nothing for me. I think it prolongs my healing time by making the area overly dry and crusty.  I've tried the product several times and this will be my last."

58.    In 2019, another user wrote on Abreva.com the following: "This product does not work.  I applied it right away as soon as I felt a tingle.  I rubbed it in.  I had no makeup on.  I applied

---

[12] Mark B. McKeough. "Comparison of New Topical Treatments for Herpes Labialis." *Archives of Dermatology*, vol. 137, 2001, pp. 1153-1158, https://jamanetwork.com/journals/jamadermatology/article-abstract/478500.

[13] For purposes of readability, this and each of the following user reviews have been revised for spelling and grammar.

it several times throughout the day.  By the next day I had the largest cold sore I have ever had.  I keep on applying this product to no avail.  Exorbitant price for no results."

59.    In 2019, another user wrote on Abreva.com the following: "I applied Abreva at the first sign of a cold sore.  Within 2 days it doubled in size.  After reading other reviews with similar results, I threw my tube away.  Never again."

60.    In 2019, another user wrote on Abreva.com the following: "I rushed to the store to get this cream as soon as I felt a cold sore coming.  After going to sleep the same night I woke up with my lip swollen and my cold sore has gotten bigger and worse.  Whatever you do DO NOT BUY THIS PRODUCT."

61.    In 2019, another user wrote on Abreva.com the following: "Total waste of money. Had no effect at all.  Took 10 days to heal."

62.    In 2019, another user wrote on Abreva.com the following: "Hadn't had a cold sore in several years, so when I felt 'the tingle' I went to pharmacy to get my usual OTC product.  Saw some outrageously priced alternatives (Abreva), as well as homeopathic treatments.  Figured anything that costs as much as Abreva must be a superior product and work as claimed.  Meh.  In day 6-7, still have the aftereffects from the cold sore (plus scab on lip, which is a first), and not impressed.  Had blistering for 4 days, which eventually subsided, much longer than what I had experienced in past (about 3 days total max).  Abreva […] didn't appear to shorten the duration of the cold sore I got."

63.    In 2018, another user wrote on Abreva.com the following: "Seems like it just grows. Now spreading to my chin.  Really frustrating."

64.    In 2018, another user wrote on Abreva.com the following: "Abreva has never helped my cold sores,  only worsened them."

65.    In 2018, another user wrote on Abreva.com the following: "I purchased this two separate times and I thought I would get results.  I haven't gotten any relief at all.  My cold sores actually got larger."

66.    In 2018, another user wrote on Abreva.com the following: "Didn't work at all.  The cold sore duration lasted its usual time frame of 7-10 days."

67.     In 2018, another user wrote on Abreva.com the following: "Time after time I have purchased Abreva and it has not worked for me."

68.     In 2018, another user wrote on Abreva.com the following: "This made my breakout, the worst breakout I've ever had!  It swelled up so bad and it was disgusting.  Will never use again."

69.     In 2018, another user wrote on Abreva.com the following: "As the product states, once you see a cold sore coming on, apply Abreva and it lessens the time of the cold sore.  Well, I did so, and it got larger! This product is way to expensive, and for the price you would think it works! I won't be buying this product again!"

70.     In 2018, another user wrote on Abreva.com the following: "Applied as directed.  No improvement at all.  Very disappointed.  If only a product worked as it claims."

71.     In 2018, another user wrote on Abreva.com the following: "I have had possibly 6 cold sores in my life, and last year when I had one I bought your Abreva product because your ads were convincing about healing in several days.  Well, it took 10 days for your product to 'heal' my cold sore.  Never again will I buy this product because it is so expensive for that tiny tube and it took 10 days to do its job, not the several days that you espouse.  Goodbye Abreva."

72.     In 2018, another user wrote on Abreva.com the following: "I used it as soon as symptoms occurred and it just made it worse. I thought maybe it was going to get really bad before it got good, but no.  I kept using it for four days and it just made it larger and made another one on top of the original one.  I wouldn't recommend this to anyone, it absolutely sucks."

73.     In 2018, another user wrote on Abreva.com the following: "I tried this medicine at every possible stage and it never worked.  At the very first sign I would cake it on and honestly I think it made it worse.  The cream softened the skin allowing the cold sore to cause more damage to the tissue."

74.     In 2018, another user wrote on Abreva.com the following: "This product didn't work for me, nor for several people I know.  I used it on two separate outbreaks two years apart and it didn't work either time.  The biggest problem is that it's over priced—absurdly expensive, as if it's guaranteed effective.  It really is not and I'm sure the company knows this.  I'm sure there are millions

of people who have wasted their money on this product and if they all reviewed it, I guarantee it wouldn't be on the market."

75.     In 2018, another user wrote on Abreva.com the following: "The question of your product being effective is iffy at best.  It says to apply for ten days.  If you put nothing on a cold sore, it would be gone in ten days anyway."

76.     In 2018, another user wrote on Abreva.com the following: "If I could give zero stars I would!  My cold sore was tiny and this stuff made it huge and oozing within hours!  It's so swollen and sore I can't believe it!  I'm so upset and will never use this again.  It should be taken off the market!"

77.     In 2018, another user wrote on Abreva.com the following: "Zero stars; it gave me a headache and didn't do anything.  I think it does more harm than good.  I didn't see that cold sore got healed quicker at all.  I never have headaches, but this medication gave me horrible headache and fatigue."

78.     In 2018, another user wrote on Abreva.com the following: "I wish I could give this product no stars.  I felt a slight tingling on the top of my lip which I assumed would be an outbreak; I immediately went and purchased Abreva and applied it to the site.  They say that if you apply it at the first sign, that it will heal your cold sore in as little as 2.5 days.  Well.  Now my lips are very swollen and what had appeared to be a small red bump is now a bunch of little clusters all over my top lips.  This went from a mild little cold sore to a huge outbreak all over my top lip!  I work in sales, and Abreva has literally ruined my life, because I now look grotesque.  Please stay away from this product!"

79.     In 2018, another user wrote on Abreva.com the following: "The product is misleading.  What was once 1 blister became 3 on the corners of my lips.  I've been dealing with this problem for most of my life and this has never happened before."

80.     In 2018, another user wrote on Abreva.com the following: "I got Abreva in the early tingling stage and it didn't do anything for me.  I thought if I kept applying it, it would help ease the discomfort, but instead of it helping it's making it worse.  I'm on tube number two and it's been a waste of money."

81.     In 2018, another user wrote on Abreva.com the following: "Abreva didn't work. I've been using it a week now, and it's only made it bigger and not better.  The blisters won't go away. It's not even looking any better."

82.     In 2018, another user wrote on Abreva.com the following: "I used the product when I started having the symptoms of a cold sore.  It only made it worse.  Taking much longer to heal than it normally would.  No, it is not worth the money!"

83.     In 2018, another user wrote on Abreva.com the following: "I got Abreva when I first began to get the symptoms of a cold sore.  I applied it and followed the instructions THOROUGHLY. However, when I woke up the next day my blister was HUGE.  My whole lip was swollen, and it began to spread even more.  I started off with ONE small cold sore and ended up with half my bottom lip filled with them!  If I could post pictures I would because it was DISGUSTING.  My cold sores took so much longer than normal to heal, and the pain was intolerable.  I will NEVER use this product again; I'd rather let the cold sore pass itself."

84.     Similarly, over 400 users have posted reviews for Abreva on Drugs.com.  There, Abreva has an average rating of only 4.5 out of 10, with 48% of users giving a 1 out of 10 rating. More than half (56%) of users reported a negative effect.

85.     For example, on March 1, 2016, one user wrote on Drugs.com the following: "In the beginning when I felt the symptoms of herpes on my lip I went to a pharmacy, which offered Abreva. I was using as per instructions—five times per day.  Seven days later my lip looked as bad as on the third day.  When I finished the first tube of Abreva, I went to another pharmacy and they again offered the same Abreva.  It's totally marketing and I am sure pharmacists are getting paid by selling this particular lip cream.  It does nothing!  It's expensive regular moisturizing cream!"

86.     On September 2, 2016, another user wrote on Drugs.com the following: "Didn't really speed healing.  I'm on day 5 and it's scabbing; thinking it will be here until day 8-10.  It didn't really help speed up healing, and I used it before the blisters appeared, when my lips felt tight in one spot."

87.     On September 29, 2016, another user wrote on Drugs.com the following: "It's just a placebo just meant to slightly reduce the discomfort associated with a herpes outbreak.  Has no effect

whatsoever on the root cause, which is the virus itself, and therefore it does not shorten the course of the outbreak as other more effective over-the-counter medicines do."

88.     On December 19, 2016, another user wrote on Drugs.com the following: "This was a waste of my $20.  I felt the tingle and rushed to the store.  I was using the medicine religiously.  The cold sore only got worse.  The swelling and the pain were almost unbearable.  This is about day 5 and I have a horrible looking scab on my lip.  I don't want to go outside.  It's so embarrassing."

89.     On February 16, 2017, another user wrote on Drugs.com the following: "I woke up in the morning with redness at the site and a very slight bump that I could tell would soon form into a blister.  I immediately applied Abreva to the site as instructed and continued re-applying every 40 minutes or so. Within 3 hours the cold sore erupted into a full-blown multi-blister sore.  I will throw away whatever i have bought and will never use Abreva again.  It literally made it 100 times worse."

90.     On April 2, 2017, another user wrote on Drugs.com the following: "Right before bed I felt the tingle and saw the tiny hint of a cold sore.  Not new to this, and knowing I couldn't get prescription meds until the next day, I sent my husband to the store to get Abreva.  I applied it that night and in the morning, and again mid-morning.  I went to the doctor in the afternoon to get a prescription medication.  Before I got home from the pharmacy, I had a HUGE cold sore.  I took the meds and continued the Abreva.  The cold sore continued to grow in size and is hideous.  I'll never use Abreva ever again."

91.     On April 20, 2017, another user wrote on Drugs.com the following: "Made my blisters worse and didn't relieve my pain.  It's too expensive to not work.  Will never buy again."

92.     On May 23, 2017, another user wrote on Drugs.com the following: "Felt a little numb on the top of my lip, so I ran to put some Abreva on it.  I used it for about a day and a half as directed (5x daily) with quite a healthy amount each time.  I realized after the day and a half that anywhere I put the Abreva, the cold sore had spread to and was now blistering.  It did the exact opposite of what it said it was supposed to do.  Will never use again."

93.     On January 30, 2018, another user wrote on Drugs.com the following: "I've gotten cold sores a few times in the past, but the one and only time I used Abreva to treat one, I found it did absolutely nothing.  It did not stop it from growing, it did not stop it from scabbing over and all in

all the cold sore still took over a week to go away as they generally do without treatment.  Abreva was a complete waste of money in my opinion as it made no difference in how a cold sore would naturally progress and heal from my experience."

94.     On November 30, 2018, another user wrote on Drugs.com the following: "Abreva doesn't work, and I'm convinced that all these comments saying it does are fake.  I've used it as directed on two different occasions now, and the blister forms anyway and ends up huge.  This is an absolute waste of $20 for a teeny little tube that does nothing at all.  Never buying this again."

95.     On January 16, 2019, another user wrote on Drugs.com the following: "This medicine does not work.  I used it for the first time and I have never had a bigger cold sore.  My lips are so swollen, it is terrible.  What a waste of money.  False advertisement for sure."

96.     On April 19, 2019, another user wrote on Drugs.com the following: "I have been getting severe cold sores since I was 6 years old.  I was so excited the first time I bought this product, even thought it was 5 times as expensive as Blistex and Carmex.  I used it faithfully.  By the next morning my lip was extremely swollen.  Three sores formed and I continued to use it 5-10 times per day.  No luck, they lasted 10 days with the same severity.  I have now used this product for two years hoping it will be different the next time.  It never is.  Unfortunately, I am not sure what tests were performed to allow the FDA approval and claim that it heals faster.  I will go back to just using Carmex and planning for 10 days of pain and embarrassment."

97.     On June 21, 2019, another user wrote on Drugs.com the following: "I just joined the pool of unfortunate souls who fell victim to this harmful product.  It's overpriced, the applicator isn't user friendly, and yes, it made the cold sore way worse than it's ever been before.  I usually get these sores right after having the flu.  Sometimes, they're barely visible.  This time, I had one tiny little spot in the center of my lip.  I applied the product generously to the entire area.  The entire bottom lip blew up within a few hours.  There needs to be class action lawsuit and a recall of this horrible product."

98.     On July 14, 2019, another user wrote on Drugs.com the following: "Completely escalated my symptoms.  I cannot believe this is happening!  Stay away from this product!"

99.     On August 2, 2019, another user wrote on Drugs.com the following: "I used Abreva at the first signs of cold sore, which I get infrequently.  Two days later the site was clearing up and I thought I was good, until several more fluid filled blisters erupted!  That never happens to me.  Very disappointed!"

100.    On August 24, 2019, another user wrote on Drugs.com the following: "Don't waste your money! I applied the product Abreva correctly only for it to make more cold sores appear."

101.    On October 7, 2019, another user wrote on Drugs.com the following: "This is my second time using Abreva.  The first time was not good, but I thought it was due to not catching the first sign of my cold sore.  So now I had the first sign of a cold sore and decided to really see if this product works.  I used Abreva and the next day my lip had more bumps and was more swollen.  Just awful experience."

102.    On March 8, 2020, another user wrote on Drugs.com the following: "I started using the very first day I felt that tingle and within 4 days I had another blister, and then just as the first one was starting to clear up, along came a third.  It's been 7 days since I started using this product and I now have 3 blisters that don't look like they're going anywhere soon.  I'm so disappointed."

103.    On March 10, 2020, another user wrote on Drugs.com the following: "Every few years I seem to forget why I quit buying Abreva.  Normally my cold sores last 3-4 days and don't get very big.  But EVERY SINGLE TIME I give Abreva a try, 1 small bump turns into 5 or 6 huge blisters so bad I can barely talk.  Literally have only had that happen when using Abreva.  I don't know why I keep going back to it.  It's horrible."

104.    Similarly, many users have posted negative reviews of Abreva on WebMD.  For example, on February 26, 2010, one user wrote on WebMD.com the following: "I had my cold sore for about a day and saw the commercial for Abreva so I went to go buy it.  I thought since it was expensive it would work the best.  WRONG!  It made my cold sore more visible!  Plus it took way longer to heal.  Not worth spending your money on it.  The commercial lies!  (What a shocker...) The girl on the commercial already had the cold sore and it was 'magically' healed with Abreva.  Ha!"

105.    On March 17, 2011, another user wrote on WebMD.com the following: "Complete waste of money!  I started using this as soon as I felt the signs of a cold sore (redness, itching) and it

didn't help at all!  While I didn't suffer the allergic reactions that many users seem to experience, this did nothing to shorten the healing time.  Some nerve to charge $20 for something so ineffective!"

106.    On February 19, 2012, another user wrote on WebMD.com the following: "The pharmacist recommended using Abreva as soon as I noticed the first signs of a cold sore.  I was told that this medication is very good and works quickly.  Seven days later it is no better and has not yet healed.  No beneficial results for an expensive drug.  Don't waste your money."

107.    On September 21, 2012, another user wrote on WebMD.com the following: "if you actually read the studies you realize that this product is generally not worth purchasing.  The reason: According to their own research, this product heals a cold sore ONLY six hours faster than NOT using it.  It is bunk."

108.    On December 18, 2012, another user wrote on WebMD.com the following: "I get small lip cold sores 3-4 times per year.  Abreva was suggested by the local pharmacist.  I tried it at the first sign of my next outbreak, but it had little or no affect.  In fact, I applied it 5 times per instructions, on a single spot, but the next morning I had 5 more spots around the original outbreak.  My outbreaks are usually small, but this time I had multiple outbreaks.  Did the Abreva promote the spreading?  Who knows.  I continued to use it.  Healing still took 2 weeks.  Waste of $20 in my opinion."

109.    On May 13, 2014, another user wrote on WebMD.com the following: "I asked my husband to pick up some cold sore medicine because I felt a cold sore coming on and I did not want it to become a full-blown blister.  It was very important as I had customer interviews for three hours each of two days the weekend coming up.  Well, the CVS pharmacy person told him that Abreva would be the product to buy.  He purchased it and brought it home.  Against my better judgement I used the product as I had heard reviews and really didn't have time to go to the store.  The next day my cold sore was a full-blown blister and after using it throughout the day I developed two blisters instead of one which has never happened.  I am very disappointed in your product and will never make a mistake of using it again.  On top of wasting money on it, I had to be out in public looking not my best because of the severity of the outbreak this product produced.  I am still using it just to keep my lip from drying out and bleeding.  Disappointed and really upset about having a product

which the pharmacy industry is pushing off to customers as a good product, in fact they are telling customers it is the best product for cold sores.  I know this product is not the best and I can now prove it."

110.   On August 11, 2016, another user wrote on WebMD.com the following: "It does not work for me.  The time frame for the cold sore to heal is the same, with or without the medication.  And the cost was $34.00, for nothing, nothing!"

111.   On November 16, 2016, another user wrote on WebMD.com the following: "I have twice tried Abreva and neither time has it worked at all for me.  Pretty expensive for a tiny tube.  I will definitely remember next time not to bother."

112.   On January 4, 2018, another user wrote on WebMD.com the following: "I get cold sore once every two-three years always resulting to Abreva.  My cold sore last from 12-14 days while using this medication as directed.  I would say this medication is absolutely not worth the high dollars it costs as opposed to the other OTC medications used to treat cold sores."

113.   On March 26, 2019, another user wrote on WebMD.com the following: "It has taken me three tries to realise that Abreva is an expensive waste of money for me.  It makes no difference to my symptoms even though I start using it as soon as I realise I am getting cold sores.  Next time, I will try something else."

114.   On January 28, 2020, another user wrote on WebMD.com the following: "It boggles me how Abreva can get away with advertising their topical cream can cure a cold sore in 2.5 days if applied at the first sign of it.  I've been using Abreva for years in the hope that it may be reducing the length of time I have a cold sore -- a costly endeavor considering the exorbitant price of Abreva.  I've never had it stop a cold sore and it's never prevented one from lasting less than 7 days.  Honestly, you'd think by how some genius would have come up with an effective treatment and run off with millions of dollars."

115.   These examples are only a small selection of the reviews that have been posted on a variety of online forums for many years, showing that thousands of purchasers have been dissatisfied with Abreva.

///

V.     **Other Sources Of Defendants' Knowledge**

116.     Online reputation management (commonly called "ORM" for short) is now a standard business practice among most major companies and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on consumer services.   "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or a brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before the damage to the individuals or brand's reputation."[14]  Many companies offer ORM consulting services for businesses.

117.     Like most companies, GSK presumably cares about its reputation and regularly monitors online consumer reviews because they provide valuable data regarding quality control issues, customer satisfaction, and marking analytics.   Reviews like those copied above would be particularly attention-grabbing for GSK's management because extreme reviews are sometimes the result of extreme problems and – just like any other company – GSK is presumably sensitive to the reputational impact of negative online reviews.  Hence, GSK's management knew or should have known about the above-reference consumer complaints shortly after each complaint was posted online.

118.     Defendants also know that their portrayal of the 06/07 clinical trial results is misleading because they were sued over the original marketing of the Product.  In 2002, GSK was sued for false advertising for claiming that Abreva "cuts healing time in half."  By the time that case was settled in 2007, GSK had already stopped using that language, and the court found injunctive relief unnecessary.  For the next several years, GSK avoided concrete claims about how fast the Product would work and limited its promotional language to what the FDA had specifically approved.

119.     However, GSK had clearly not learned its lesson, because in 2013 it began to advertise that the Product can heal a cold sore in two and a half days—a statement that is at least as misleading to a reasonable consumer as the original "in half" language.  Not only is it based on the same incorrect

---

[14] Online Reputation, https://websolutions-maine.com/online-reputation/.

interpretation of the same flawed studies, but "heals in two and a half days" is even farther from the truth. An untreated cold sore typically heals in about two to four weeks, so by citing the "two and a half days" number, Defendants are in effect representing that the Product heals cold sores in just *one quarter* of the time. But as demonstrated, this is inaccurate.

## VI. The Impact of Defendants' Wrongful Conduct

120. Despite clinical studies demonstrating the inefficacy of Abreva and its main ingredient, docosanol, Defendants have conveyed and continue to convey one uniform message: Abreva can shorten healing time to 2 ½ days and lead to symptomatic and anti-viral benefits.

121. As the manufacturer and distributor of Abreva, Defendants possess specialized knowledge regarding Abreva's contents and the effects of their ingredients, and Defendants are in a superior position to know whether Abreva works as advertised.

122. Specifically, Defendants knew, but failed to disclose, or should have known, that Abreva cannot provide the relief it is advertised as providing and that well-conducted, clinical studies have found docosanol to be ineffective at remedying cold sores and providing symptomatic and anti-viral benefits.

123. Plaintiff and class members have been and will continue to be deceived or misled by Defendants' false and deceptive representations.

124. Defendants' representations and omissions were a material factor in influencing Plaintiff's and the class members' decision to purchase Abreva. In fact, the only purpose for purchasing Abreva is to obtain the represented benefits.

125. Defendants' conduct has injured Plaintiff and class members because Abreva carries a price premium, leading consumers to pay more for the Product than they otherwise would absent the representations.

126. Plaintiff and each class member were harmed by purchasing Abreva because Abreva is not capable of providing their advertised benefits. As a result, Plaintiff and each class member lost money and property by way of purchasing Defendants' ineffective topical treatment.

## CLASS ALLEGATIONS

127.    Class Definition: Plaintiff brings this class action on behalf of herself, and as a class action on behalf of the following putative classes (the "Class"):

**Nationwide Class**
All individual residents of the United States who purchased the Product through the date of class certification.  Excluded from the Class are: (1) Defendants and all directors, officers, employees, partners, principals, shareholders and agents of Defendants; (2) Any currently sitting United States District Court Judge or Justice, and the current spouse and all other persons within the third-degree of consanguinity to such judge/justice; and (3) Class Counsel.

**California Sub-Class**
All individual residents of the State of California who purchased the Product through the date of class certification.  Excluded from the Class are: (1) Defendants and all directors, officers, employees, partners, principals, shareholders and agents of Defendants; (2) Any currently sitting United States District Court Judge or Justice, and the current spouse and all other persons within the third-degree of consanguinity to such judge/justice; and (3) Class Counsel.

128.    Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified, including through the use of multi-state subclasses to account for material differences in state law, if any.

129.    Numerosity and Ascertainability: Plaintiff does not know the exact number of members of the putative classes.  Due to Plaintiff' initial investigation, however, Plaintiff is informed and believes that the total number of Class members is at least in the tens of thousands, and that members of the Class are numerous and geographically dispersed throughout the United States and California.  Plaintiff believes that Class and California Subclass Members are so numerous that joinder of all members is impracticable.  While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, including Defendants' records, either manually or through computerized searches.

130.    Typicality and Adequacy: Plaintiff's claims are typical of those of the proposed Class, and Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Plaintiff does not have any interests that are antagonistic to those of the proposed Class.  Plaintiff has retained counsel competent and experienced in the prosecution of this type of litigation.

131.   <u>Commonality</u>: There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class Members.  These include:

     (a)  whether Defendants committed the conduct alleged herein;

     (b)  whether Defendants' conduct constitutes the violations of laws alleged herein;

     (c)  whether Defendants' labeling, sale and advertising set herein are unlawful, untrue, or are misleading, or reasonably likely to deceive;

     (d)  whether Defendants' conduct violates public policy;

     (e)  whether Defendants engaged in unfair or unlawful business practices in marketing and distributing the Product;

     (f)  whether Defendants knowingly concealed or misrepresented material facts for the purpose of inducing consumers into spending money on the Product;

     (g)  whether Defendants' representations, concealments and non-disclosures concerning the Product are likely to deceive the consumer;

     (h)  whether Defendants' representations, concealments and non-disclosures concerning the Product violate the UCL and/or the common law;

     (i)  whether Defendants should be permanently enjoined from making the claims at issue;

     (j)  whether Defendants have been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon Defendants by Plaintiff and the Class; and

     (k)  whether Plaintiff and the Class are entitled to restitution and damages.

132.   <u>Predominance and Superiority</u>: Common questions, some of which are set out above, predominate over any questions affecting only individual Class members.  A class action is the superior method for the fair and just adjudication of this controversy.  The expense and burden of individual suits makes it impossible and impracticable for members of the proposed Class to prosecute their claims individually and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for

1    inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer

2    management difficulties and provides the benefits of single adjudication, economy of scale, and

3    comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment

4    of the liability issues will ensure that all claims and claimants are before this Court for consistent

5    adjudication of the liability issues.

6        133.    Manageability: The trial and litigation of Plaintiff' and the proposed Class' claims are

7    manageable.  Defendants have acted and refused to act on grounds generally applicable to the Class,

8    making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

9        134.    Notice: If necessary, notice of this action may be affected to the proposed Class

10   through publication in a manner authorized in the California Rules of Court, Civil Code, and/or the

11   Federal Rules of Civil Procedure.  Also, Class members may be notified of the pendency of this

12   action by mail and/or email, through the distribution records of Defendants, third party retailers, and

13   vendors.

14   

**FIRST CAUSE OF ACTION**

15   

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,**

16   

**CAL. BUS. & PROF. CODE § 17200, *ET SEQ*.**

17       135.    Plaintiff incorporates by this reference the allegations contained in the preceding

18   paragraphs as if fully set forth herein.

19       136.    Plaintiff brings this claim individually and on behalf of the members of the proposed

20   California Subclass against Defendants.

21       137.    California Business and Professions Code § 17200 prohibits any "any unlawful,

22   unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

23   For the reasons discussed above, Defendants have engaged in unlawful and unfair acts in violation

24   of California Business & Professions Code §17200.

25       138.    As alleged herein, Plaintiff have standing to pursue this claim as Plaintiff have

26   suffered injury in fact and have lost money or property as a result of Defendants' actions.

27   Specifically, Plaintiff purchased the Product for their own personal use.  In so doing, Plaintiff relied

28   upon the representations referenced above.

---

**Unlawful**

139.    Defendants' conduct is unlawful, in violation of the UCL, because it violates the Consumers Legal Remedies Act, the Song-Beverly Act, the California's False Advertising Law, and the Magnuson-Moss Warranty Act.  Defendants' conduct also amounts to fraud.

**Unfair**

140.    Defendants' conduct is unfair in violation of the UCL because it violates California public policy, legislative declared in the Song-Beverly Consumer Warranty Act, requiring a manufacturer to ensure that goods it places in the market are fit for their ordinary and intended purpose.  Defendants violated the Song-Beverly Act because Abreva is unfit for its most central purpose: remedying cold sores.  Defendants' conduct is also unfair because it amounts to fraudulent conduct as described throughout and as described further below.

141.    Defendants also acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner.  Defendants engaged in unfair business practices and acts in at least the following respects:

       a.    Defendants promoted and sold Abreva with knowledge that it did not work as advertised;

       b.    Defendants promoted and sold Abreva while exceeding the scope of the FDA approval;

       c.    Defendants failed to disclose that Abreva was ineffective, and represented through advertising, its website, product packaging, and the general context it created that Abreva possesses particular qualities that were inconsistent with Defendants' actual knowledge of the product.

142.    The gravity of harm resulting from Defendants' unfair conduct outweighs any potential utility.  The practice of selling ineffective cold sore remedies—and continuing to sell Abreva without full and fair disclosure—harms the public at large and is part of a common and uniform course of conduct.

143.    The harm from Defendants' conduct was not reasonably avoidable by consumers. Abreva does not work and despite receiving a large volume of consumer complaints, Defendants did

not alter their course of conduct.  Instead, Defendants continued to sell Abreva at consumers' expense.

144.    There were reasonably available alternatives that would have furthered Defendants' business interests by satisfying and retaining its customers while maintaining profitability, such as: (1) acknowledging that the over-the-counter remedy was not effective or not as effective as claimed; (2) adequately disclosing this knowledge to prospective purchasers; (3) and offering refunds or a suitable replacement to affected consumers.

**Fraud by Omission**

145.    Defendants' conduct is fraudulent in violation of the UCL because it is likely to deceive a reasonable consumer and:

> a.    Defendants knowingly and intentionally concealed from Plaintiff and Class members that Abreva was not effective as they claimed;

> b.    Defendants volunteered information to Plaintiff and the Class through advertising and other means that Abreva had qualities or characteristics that they did not have without disclosing facts that would have materially qualified those partial representations; and

> c.    Defendants promoted the abilities of Abreva but failed to correct its misleading partial disclosures.

146.    Defendants had ample means and opportunities to alert Plaintiff and Class members of the inefficacious nature of Abreva, including on Defendants' webpages, in advertisements, and on Abreva's external packaging.  Defendants uniformly failed to disclose the true nature of Abreva. Had Defendant done so, Plaintiff and Class members would not have purchased Abreva at the prices they did.

147.    Defendants were under a duty to disclose the true nature of Abreva because of their exclusive knowledge before selling Abreva, studies that have since been conducted on Abreva's primary ingredient, docosanol, complaints made directly to Abreva, as well as online complaints and online reputation management, as well as a prior lawsuit alleging similar conduct.  All of this would have put Defendants on notice of the issues complained of here.

148.    Plaintiff and Class members suffered injury in fact, including lost money or property, as a result of Defendants' unlawful, unfair, and fraudulent acts and omissions.  Absent Defendants' unlawful, unfair, and fraudulent conduct, Plaintiff and Class members would not have purchased Abreva, or would not have purchased Abreva at the prices they did.  Nonetheless Plaintiff Smith remains very much interested in purchasing Abreva in the future as she believes Defendants are reputable companies that otherwise manufacture and produce over-the-counter products that are high in quality.

149.    Through their unlawful, unfair, and fraudulent conduct, Defendants acquired money directly and as passed on by retailers (i.e. Amazon, CVS, Walgreens).

150.    Plaintiffs and Class members accordingly seek appropriate relief, including (1) restitution under the UCL, and (2) such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and fraudulent practices.  Plaintiffs also respectfully seek reasonable attorney's fees and costs under applicable law, including under California Code of Civil Procedure 1021.5.

## SECOND CAUSE OF ACTION

### VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT,

### CAL. CIV. CODE § 1750, *ET SEQ.*

151.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

152.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

153.    Defendants are "person[s]" within the meaning of California Civil Code sections 1761(c) and 1770, and provided "goods" within the meaning of sections 1761(a) and 1770.

154.    Defendants' acts and practices, as alleged in the complaint, violate California Civil Code sections 1770(a)(5), (7), and (9) because they include unfair and deceptive acts and practices in connection with transactions—the sale of Abreva.  In violation of the CLRA, Defendants:

      a.    Represented that Abreva had characteristics, uses, and benefits it does not have;

b.      Represented that Abreva is of a standard, quality, or grade when in fact it is not; and

c.      Advertised Abreva with intent not to sell it as advertised.

155.    Through Avanir's early testing, the FDA's comments related to the limited efficacy of Abreva and docosanol, studies prepared by the scientific and medical community disproving Defendants' claims, as well as numerous consumers who reported to Defendants directly that Abreva did not work, including the filing and ultimate settlement of a lawsuit, Defendants knew that Abreva was inefficacious.

156.    Defendants were under a duty to disclose that Abreva did not work as advertised because it had superior knowledge stemming from those categories described in the preceding paragraph as well as because it made partial, materially misleading representations about Abreva's ability to treat cold sores.

157.    Defendants had ample means and opportunities to disclose to Plaintiffs and Class members that Abreva was inefficacious, including through its advertisements, on external packaging, and other such material distributed by Defendants.  Despite its exclusive knowledge and opportunities to disclose this knowledge, Defendant failed to disclose this knowledge to Plaintiff and Class members prior to purchase.

158.    Defendants' misrepresentations and omissions were material.  Had Plaintiff and Class members known that Abreva was ineffective as advertised, they would not have purchased Abreva, or would not have purchased it at the price they did.  Nonetheless Plaintiff Smith remains very much interested in purchasing Abreva in the future as she believes Defendants are reputable companies that otherwise manufacture and produce over-the-counter products that are high in quality.

159.    In accordance with California Civil Code section 1782(a), Plaintiff's counsel sent via certified mail, return receipt requested, a letter on behalf of the Class on August 9, 2021 to Defendants' principal place of business, advising Defendants' of their violations and that it must correct, replace, or otherwise rectify the goods alleged to be in violation.  Defendants failed to correct their business practices or provide the requested relief within 30 days.  Accordingly, Plaintiff now seeks monetary damages under the CLRA.

160.     Plaintiff was injured by Defendants' CLRA violations.  As a result, Plaintiff is entitled to actual damages in an amount to be proven at trial, reasonable attorney's fees and costs, declaratory relief and punitive damages.

### THIRD CAUSE OF ACTION

### VIOLATION OF CALIFORNIA'S SONG-BEVERLY CONSUMER WARRANTY ACT, CAL. CIV. CODE § 1792, *ET SEQ.*

161.     Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

162.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

163.     Plaintiff is a "buyer" within the meaning of California Civil Code § 1791(b).  Plaintiff purchased Abreva.

164.     Defendants are manufacturers within the meaning of California Civil Code section 1791(j).  Defendants were responsible for producing Abreva and directed and were involved in all stages of the production and manufacturing process.

165.     Abreva is a "consumer good[]" within the meaning of California Civil Code § 1791(a).

166.     Defendants impliedly warranted to Plaintiff that Abreva was "merchantable" under California Civil sections 1791.1 and 1792.

167.     Defendants breached the implied warranty of merchantability by producing, manufacturing, and selling Abreva that were not of merchantable quality.  As described throughout despite Defendants' representations, Abreva does not work as advertised.  Therefore, it is unfit for the ordinary purpose for which it is used and would not pass without objection in the trade.

168.     As a direct and proximate cause of Defendant's breach of the Song-Beverly Consumer Warranty Act, Plaintiff and Class members have been damaged in an amount to be proven at trial.

169.     Plaintiff seeks costs and expenses, including reasonable attorney's fees, under California Civil Code section 1794.

## FOURTH CAUSE OF ACTION

### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW,

### CAL. BUS. & PROF. CODE § 17500, ET SEQ.

170.  Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

171.  Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

172.  Defendants' acts and practices, as described herein, have deceived and/or are likely to continue to deceive class members and the public.  As described above, and throughout this Complaint, Defendants misrepresented Abreva qualities, characteristics, and abilities and concealed knowledge that Abreva did not have those qualities, characteristics, and abilities.

173.  By its actions, Defendants disseminated uniform advertising regarding Abreva into California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, et seq.  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

174.  The above-described false, misleading, and deceptive advertising Defendants disseminated continues to have a likelihood to deceive and in that Defendants failed to disclose the true qualities, characteristics, and abilities of Abreva.

175.  Defendants continued to misrepresent to consumers that Abreva is effective, when, in fact, that was not the case as described throughout this Complaint.

176.  In making and disseminating the statements alleged herein, Defendants knew, or should have known, its advertisements were untrue and misleading in violation of California law. Plaintiff and class members based their purchasing decisions on Defendants' omitted material facts. The revenue attributable to Abreva through Defendants' false and misleading advertisements likely amounts to hundreds of millions of dollars.  Plaintiffs and class members were injured in fact and lost money and property as a result.

177.   The misrepresentation and non-disclosures by Defendants of the material facts described and details herein constitute false and misleading advertisements and, therefore, constitute violations of Cal. Bus. & Prof. Code § 17500, *et seq.*

178.   As a result of Defendants' wrongful conduct, Plaintiffs and the class members lost money in an amount to be proven at trial.  Plaintiffs and the class members are therefore entitled to restitution as appropriate for this cause of action.

179.   Plaintiffs and class members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorney's fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## FIFTH CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY

180.   Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

181.   Plaintiff brings this claim individually and on behalf of the members of the Class and the proposed California Subclass against Defendants.

182.   Defendants are and were at all times merchants with respect to OTC products, namely Abreva.

183.   In its advertisements, brochures, packaging, and on its website, Defendants expressly warranted that Abreva heals cold sore when applied.  Defendants' expressly warranted that Abreva heals cold sores in 2 ½ days and that it provides symptomatic and anti-viral benefits.  These representations formed part of the basis of the bargain that was reached when Plaintiff and Class members purchased Abreva.

184.   Defendants breached these express warranties by entering into the stream of commerce and selling to consumers a product, namely Abreva, that does not have these benefits. That is, Abreva does not heal cold sores in 2 ½ days and fails to provide symptomatic and anti-viral benefits.

185.    As a direct and proximate cause of Defendants' breach of express warranty, Plaintiff and the Class have been injured and harmed because: (a) they would not have purchased Abreva on the same terms if they knew that Defendants' claims were not true; (b) they paid a price premium for Abreva due to the claims; and (c) Abreva does not have the characteristics, uses, benefits, or qualities promises in that Abreva does not heal cold sores in 2 ½ days, does not provide symptomatic or anti-viral benefits.

186.    On or about August 9, 2021, prior to filing this action, Plaintiff's counsel sent a pre-suit notice via certified mail, return receipt requested, to Defendants at their principal places of business.  This letter was served on Defendants and complies in all respects with U.C.C. § 2-607. Defendants have refused to remedy this breach.  This Complaint follows.

**SIXTH CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

187.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

188.    Plaintiff brings this claim individually and on behalf of the members of the Class and the proposed California Subclass against Defendants.

189.    Defendants, as the designer, manufacturer, marketer, distributor, and/or seller, affixed 2 ½ day healing claims to Abreva's advertising and marketing, including on its website and in commercials, as well as on its packaging, impliedly warranting that Abreva heals cold sores in that time and has symptomatic and anti-viral benefits.

190.    As alleged in detail above, at the time of purchase, Defendants had reason to know that Plaintiff, as well as Class members, intended to use Abreva to heal their cold sores and for its purported symptomatic and anti-viral properties.

191.    This became part of the basis of the bargain between the parties.

192.    Based on that implied warranty, Defendants sold the goods to Plaintiffs and other Class members who bought the goods from Defendants.

193.    At the time of purchase, Defendants knew or had reason to know that Plaintiff and Class members were relying on Defendants' skill and judgment to select or furnish a product that

was suitable for this particular purpose, and Plaintiff and the Class justifiably relied on Defendants' skill and judgment.

194.    Abreva was not suitable for this purpose.

195.    Plaintiff purposed Abreva believing they had the qualities Plaintiff sought, based on the deceptive advertising and labeling, but Abreva was unsatisfactory for the reasons described here.

196.    Abreva was not merchantable in California, as it was not of the same quality as other products in the category generally acceptable in the trade.

197.    Abreva was also unmerchantable and breached the implied warranty because they did not conform to the promises or affirmations of fact made on the container or label and on other grounds as set forth in Commercial Code 2314(2).

198.    As a result of this breach, Plaintiff and the Class did not receive goods as impliedly warranted by Defendants.

199.    Within a reasonable amount of time after Plaintiff discovered the breach, Plaintiff notified Defendants of such breach.

200.    As a proximate result of this breach of warranty, Plaintiff and Class members have been damaged in an amount to be determined at trial.

201.    As Plaintiff remains very much interested in purchasing from Defendants in the future as described above, Plaintiff and the Class are entitled to injunctive and equitable relied, restitution, and an order for the disgorgement of funds by which Defendants were unjustly enriched.

## SEVENTH CAUSE OF ACTION

### FRAUDULENT MISREPRESENTATION

202.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

203.    Plaintiff brings this claim individually and on behalf of the members of the Class and the proposed California Subclass against Defendants.

204.    At all times relevant, Defendants were engaged in the business of designing, manufacturing, distributing, marketing, and selling Abreva.

205.    Defendants, acting through its representatives or agents, delivered Abreva to its own distributors and various other distribution channels.

206.    Defendants willfully, falsely, and knowingly omitted various material facts regarding the quality and character of Abreva as discussed throughout.

207.    Rather than inform consumers of the truth regarding Abreva, Defendants misrepresented the quality, including its 2 ½ days healing claims and its symptomatic and anti-viral claims, including at the time of purchase.

208.    Defendants made these material misrepresentations to boost or maintain sales of Abreva, and in order to falsely assure purchasers of Abreva that Defendants are reputable companies and that Abreva could perform as promised.  The false representations were material to consumers because the representations played a significant role in the value of Abreva as purchased.

209.     Although Defendants had a duty to ensure the accuracy of the information regarding the 2 ½ healing claims and its symptomatic and anti-viral claims, it did not fulfill these duties.

210.    Defendants misrepresented material facts partly to pad and protect their profits, as it saw that profits and sales of Abreva were essential for their continued growth and to maintain and grow their reputation as a premier make of over-the-counter products.  Such benefits came at the expense of Plaintiff and Class members.

211.    Plaintiff and Class members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.  Plaintiff's and Class members' actions were justified given Defendants' misrepresentations.  Defendants were in the exclusive control of material facts, and such facts were not known to the public.

212.    Due to Defendants' misrepresentations, Plaintiff and Class members sustained injury due to the purchase of Abreva that did not live up to their advertised representations.  Plaintiff and Class members are entitled to recover full or partial refunds for Abreva due to Defendants' misrepresentations, or they are entitled to damages for the diminished value of the Product in an amount to be determined at trial.

213.    Defendants' acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff's and Class member's rights and well-being, and in

part to enrich itself at the expense of consumers.  Defendants' acts were done to gain commercial advantage over competitors, and to drive consumers away from considerations of competitors' products.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

### EIGHTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

214.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

215.    Plaintiff brings this claim individually and on behalf of the members of the Class and the proposed California Subclass against Defendants.

216.    Defendants negligently and recklessly omitted certain material facts regarding Abreva.  Defendants failed to warn consumers that Abreva did not perform as warranted or advertised.

217.    The advertisements and warranties, which were made expressly through uniform representations from Defendants were material and would have been considered by a reasonable consumer, including Plaintiff and Class members, in making purchasing decisions.

218.    Plaintiff and Class members acquired Abreva believing it would function as advertised.

219.    As a result, Plaintiff and Class members were directly and proximately injured by Defendants' negligence in failing to inform Plaintiffs and Class members of Abreva's true nature, namely that it does not heal cold sores in 2 ½ days and does not have symptomatic or anti-viral properties.  Accordingly, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

### NINTH CAUSE OF ACTION

### FRAUD BY OMISSION

220.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

221.    Plaintiff brings this claim for fraud by omission pursuant to California Civil Code §§ 1709-1710, et seq., individually and on behalf the California Subclass and the Class given the substantial similarities between states.

222.    Defendants actively concealed material facts, in whole or in part, with the intent to induce Plaintiff and members of the Class to purchase Abreva.  Specifically, Defendants actively concealed the truth about Abreva by not disclosing that it does not heal cold sores in 2 ½ days and that it does not have symptomatic and anti-viral properties.

223.    Plaintiff and Class was unaware of these omitted material facts and would not have purchased Abreva, or would have paid less, if they had known of these concealed and omitted facts.

224.    Plaintiff and the Class suffered injuries that were proximately caused by Defendants' active concealment and omissions of material facts.

225.    Defendants' fraudulent concealments and omissions were a substantial factor in causing the harm suffered by Plaintiff and Class members as they would not have purchased Abreva if all material facts were properly disclosed.

### TENTH CAUSE OF ACTION

### UNJUST ENRICHMENT

226.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

227.    Plaintiff brings this claim individually and on behalf of the members of the Class and the proposed California Subclass against Defendants.

228.    As a result of Defendants' unlawful and misleading labeling, marketing, and sale of Abreva, Defendants were enriched at the expense of Plaintiff and the Class.

229.    Defendants sold products that did not perform as advertised and were worthless.

230.    Plaintiff paid a premium price for Abreva.

231.    Thus, it is against equity and good conscience to permit Defendants to retain the ill-gotten benefits received from Plaintiff and the Class members given that Abreva was not what Defendants purported them to be.

232.    It would be unjust and inequitable for Defendants to retain the benefit, warranting restitutionary disgorgement to Plaintiff and Class members of all monies paid for Abreva, and/or all monies paid for which Plaintiff and Class members did not receive the benefit.

233.    As a direct and proximate result of Defendants' actions, Plaintiff and Class members have suffered in an amount to be proven at trial.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff, on behalf of themselves and as representative of all other persons similarly situated, pray for judgment against Defendants, as follows:

1.  An order certifying the nationwide Class and California Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and California Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and California Subclass Members;

2.  An order declaring that Defendants' conduct violates the statutes referenced herein;

3.  An order permanently enjoining Defendants from pursuing the policies, acts, and practices complained of herein;

4.  An order finding in favor of Plaintiff, the Class, and the California Subclass on all counts asserted herein;

5.  For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

6.  For pre-judgment interest on all amounts awarded;

7.  For an order of restitution, disgorgement, and all other forms of monetary relief;

8.  For an order awarding Plaintiff and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit; and,

9.  Such other and further relief as the Court may deem necessary and appropriate.

1

## **JURY TRIAL DEMANDED**

2
Plaintiff demands a trial by jury on all claims so triable.

3

4

5
Dated: December 3, 2021

**BURSOR & FISHER, P.A**.

6

By:   /s/ *L. Timothy Fisher*
L. Timothy Fisher

7

8
L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)

9
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596

10
Telephone: (925) 300-4455
Facsimile: (925) 407-2700

11
E-mail: ltfisher@bursor.com
slitteral@bursor.com

12
*Attorneys for Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28